## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

****

| | |
|---|---|
| Union Construction Workers Health Plan<br>    Board of Trustees<br>P.O. Box 687<br>Toledo, OH  43697<br><br>         Plaintiff,<br><br>  v.<br><br>KEYBANK NATIONAL<br>ASSOCIATION<br>127 Public Square<br>Cleveland, OH 44114<br><br>and<br><br>VICTORY CAPITAL MANAGEMENT,<br>INC.<br>c/o Csc-Lawyers Incorporating<br>Service, statutory agent<br>50 West Broad Street<br>Suite 1800<br>Columbus, OH 43215<br><br>Defendants. | Case No.:<br><br>Judge:<br><br>**COMPLAINT FOR BREACHES OF FIDUCIARY<br>DUTY UNDER THE EMPLOYEE RETIREMENT<br>INCOME SECURITY ACT**<br><br>David W. Zoll (0008548)<br>Wesley D. Merillat (0080253)<br>**ZOLL KRANZ & BORGESS, LLC**<br>6620 W. Central Ave. Suite 200<br>Toledo, OH 43617<br>Phone: (419) 841-9623<br>Fax:    (419) 841-9719<br>Email: david@toledolaw.com<br>           wes@toledolaw.com |

****

## I.  INTRODUCTION

1.      Plaintiff alleges the following, based in part upon the investigation of Plaintiff's counsel,

which included, but was not limited to, a review of the Union Construction Worker's Health

Plan, as amended and restated effective March 23, 1998, and subsequent amendments

(hereinafter the "Plan"), Plan holdings, correspondence with and documents provided by

Defendants, and U.S. Securities and Exchange Commission ("SEC") filings on Plan holdings.

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.  NATURE OF THE ACTION

2.      Plaintiff brings this action on behalf of the Union Construction Workers Health Plan ("Plan") pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3) against certain investment fiduciaries of the Plan for violations of ERISA.

3.      The Plan is a multiemployer collectively bargained "employee welfare plan" under ERISA.

4.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan and the Plan's assets, in accordance with their written instructions and the terms of the Plan.

5.      Plaintiff alleges that Defendants directed investment of the Plan's assets in non-agency mortgage-backed and/or collateralized securities despite the fact that Defendants knew that such investments were not permitted by the Plan's Investment Policy Statement and knew or should have known that such investments were unduly risky and imprudent due to poor quality, inadequate liquidity, high volatility, and/or loans made on a "low documentation" basis, without adequate consideration for the borrowers ability to repay.

6.      Defendants invested over Two Million Dollars ($2,000,000) of the Plan's assets in investments that failed to meet the criteria of the Plan's Investment Policy.  These assets have declined in value and are, for the most part, not marketable at the present time.  The Defendants' breaches of duty have caused the Plan to lose an amount as yet unknown, but reasonably estimated to be $2,000,000.

7.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502(a)(2), and 29 U.S.C. §§ 109 & 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief, constructive trust, restitution, equitable tracing, and other monetary relief.

8.      Once Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

### III. JURISDICTION AND VENUE

9.      **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1),  29 U.S.C. §1132(e)(1).

10.      **Personal Jurisdiction.**  ERISA provides for nationwide service of process.  ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States and therefore this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because Defendants would all be subject to the jurisdiction of a court of general jurisdiction in the State of Ohio.

11.      **Venue.**  Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, at least some of the fiduciary breaches for which relief is sought occurred in this district, and Defendants transact business in this district.

## IV.  PARTIES

### A.  Plaintiff.

12.     Plaintiff Union Construction Workers Health Plan Board of Trustees is the duly appointed Board of Trustees of the Plan, and the named fiduciary of the Plan.

### B.  Defendants.

13.     Defendant KeyBank National Association ("KeyBank") is a corporation with its principal place of business located in Cleveland, Ohio.

14.     Defendant Victory Capital Management, Inc. ("Victory") is a corporation formed in the state of New York, with its principal place of business located in Cleveland, Ohio.

## V.  THE PLAN

### A.  Background.

15.     The Plan is a multiemployer collectively bargained "employee welfare plan" under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended.

16.     The Plan furnishes hospital, medical, surgical, death income disability, and related welfare benefits to its participants.

17.     The Plan, and the coverages and benefits provided thereunder, are funded by contributions from participating Employers in accordance with underlying collective bargaining agreements between various contractors under the umbrella of the Construction Contractors' Council and with local construction labor unions, including Bricklayers Local No. 3, Iron Workers Local No. 55, Roofers Local No. 134, Painters Local No. 7, Painters Local No. 1020,

Bricklayers Local No. 1, Tile Setters Local No. 3, Glaziers Local No. 948, and Sheet Metal Workers Local No. 33, Toledo District.

18.     The Plan is administered by a Board of Trustees, the Plaintiff herein.

19.     The Trustees are charged with the responsibility for the investment of the assets of the Trust Fund. 29 U.S.C. § 1103(a).

20.     To assist the Trustees in this function, the Trustees are authorized and permitted to engage the services of an Investment Manager. 29 U.S.C. § 1102(c) and to delegate certain fiduciary duties to an investment manager.


## VI.  DEFENDANTS' FIDUCIARY STATUS

21.     **Named Fiduciaries**.  Every ERISA plan must have one or more "named fiduciaries." ERISA 402(a)(1), 29 U.S.C. § 1102(a)(1).    The person(s) named as the "administrator" in the plan instrument is automatically a named fiduciary.

22.     Pursuant to the Plan Document, the Union Construction Workers Health and Welfare Plan and Trust's Board of Trustees (the Plaintiff herein) is Administrator of the Plan ("Trustees"), as that term is defined under ERISA.

23.     The Trustees have the authority to engage the services of an Investment Manager who possesses the necessary specialized research facilities and skilled manpower to assure their expertise as to the current financial markets for investment.

24.     **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly identified under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i).

25.     Defendants have both acknowledged that each served as a fiduciary of the Plan. (See Exhibit A).

26.     As each of the Defendants was a fiduciary with respect to the Plan, each owed fiduciary duties to the Plan and the participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

27.     As fiduciaries, Defendants were required by ERISA to manage and administer the Plan, and the Plan's investments strictly in accordance with the Plan's Investment Policy and in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

## VII.    FACTS BEARING ON FIDCUIARY BREACH

28.     The Plan's Investment Policy Statement (See Exhibit B). sets forth an investment strategy for intermediate-to-long-term assets, known as the Intermediate - Long Term Investment Fund ("ILTIF").

29.     Under the Plan's Investment Policy, ILTIF investments are required to be exclusively invested in marketable debt obligations issued by (1) the United States Government or an agency of the United States Government, (2) domestic corporations, and (3) domestic banks and other financial institutions of the United States.

30.     The Investment Policy does not permit ILTIF investment in any marketable debt obligation issued by individuals.

31.     The Investment Policy sets forth quality restraints requiring all issues to be limited to "A" or better quality, as established by a recognized rating service.

32.     Investments are subject to maturity constraints in that the average par-weighted maturity of the ILTIF Account must be maintained at a level not to exceed five (5) years.

33.     The Investment Policy requires that there is adequate marketability for each issue selected for the ILTIF Account.

34.     The Investment Policy cautions against the use of derivatives (such as Mortgage-backed securities) in its portfolio and limits the use of derivatives to those whose risk characteristics are in keeping with the objectives of the plan.  Derivatives with volatility, lack of marketability, or other risks are not appropriate to the Plan's objectives and are to be avoided.

### 1.     Fall of subprime lending industry

35.     The residential mortgage industry saw rapid growth in the origination of subprime loans.

36.     The proliferation of subprime loans has been attributed to a confluence of factors that occurred in 2004 and 2005, including seismic shifts in real estate prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate:  Federal Deposit Insurance Corporation on Mortgage Market Turmoil:  Causes and Consequences, Mar. 22, 2007, available at http://www.fdic.gov/news/news/speeches/archives/2007/chairman/spmar22071.html.

37.     This mortgage market was further fueled by significant mortgage backed securities (MBS) liquidity, with investors increasingly seeking yield through higher risk. Id.

38.     It is well documented that in order to take advantage of this subprime market, lenders began weakening their underwriting standards, including:

(a).        reducing the minimum credit score borrowers need to qualify for certain loans;

(b).        allowing borrowers to finance a greater percentage of a property's value;

(c).         introducing new products designed to lower borrowers' monthly payments for an initial period; and

(d).        allowing borrowers to take out loans with little, if any, documentation of income and assets.

See Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

39.     As early as 2004, industry watchdogs began expressing fears that relaxed lending practices were increasing risks for borrowers and lenders in the overheated real estate market. See Simon, *Mortgage Lenders, supra.*  As lenders were making it easier for borrowers to qualify for a loan by such practices described above, they were also greatly increasing the likelihood that borrowers would be unable to make payments and that defaults would rise.

40.     However, lenders continued to make substandard loans because they knew they could shift the risk associated with such loans by securitizing their subprime mortgage receivables.

41.     Lenders pooled their mortgage receivables into trusts, and Wall Street investment banks securitized the mortgage pool by slicing them into specialized debt securities referred to as

"collateralized mortgage obligations" (CMOs), whose yields were contingent on debtors paying the mortgage debt underlying the CMO.

42.     In May 2005, bank regulators issued their first-ever guideline for credit risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well. *See* Testimony of Sandra L. Thomson, *supra*.  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the marketplace that bank regulators were concerned about the underwriting standards and risk management practices of subprime lenders.

### 2.     Defendants Ignored Warnings Regarding Risks of Subprime Industry

43.     Despite the restrictive language of the Plan's Investment Policy and the many warnings issued by industry analysts and government regulators, as well as other negative indicators, such as rising interest rates and a cooling housing market, Defendants sought out investment of the Plan's assets in non-agency backed residential mortgage-backed securities.

44.     On October 3, 2007, Defendants made the following recommendation for changing the Plan's Investment Policy Statement:

> "Section B, 1 (ILTIF Acct Security types) we would like to add Mortgage-backed (MBS), Asset-backed (ABS), and Commercial Mortgage-backed (CMBS) securities to the list of "permitted" assets in this section.  These securities are a well-accepted part of the fixed income market and we believe their inclusion in the portfolio can add excess returns and help control risk in the portfolio."

45.     The Trustees did not accept or adopt this recommendation.

46.     Nonetheless, Defendants proceeded to invest in such securities, despite the Plan's restriction, without disclosure to Plaintiff.

47.     The Defendant did list the investments on the statement of holdings, but these investments were listed as corporate bonds, even though no corporation providing backing for the securities and no corporation issued the securities.

### 3.      Undisclosed Risk

48.     The securities purchased by Defendants had significant credit risk, unlike agency pass through securities which are free of credit risk.  These risks were not disclosed.

49.     Defendants further failed to appreciate, or at least failed to communicate, the significant interest rate risk.  Interest rate risk is amplified by borrowers' ability to prepay their mortgages. The fraction of a pool of mortgages which will prepay in any period, known as prepayment speed, can have a significant impact on interest rate risk. This risk occurs when mortgages are paid off at a faster or slower rate than that predicted or expected.  Defendants failed to understand, appreciate, and / or communicate this risk.

50.     Defendants knew or, had they properly discharged their fiduciary obligations, would have known that investment in non-agency residential mortgage-backed securities were improper, posed an unacceptable risk to Plaintiff's investment, and was further inconsistent with the Plan's investment objectives.

51.     Attached as Exhibit C is a holdings statement identifying improper and/or imprudent investments.

52.     Plaintiff's losses attributable to Defendants improper and/or imprudent investments are about Two Million Dollars ($2,000,000).

53.     In a May 28, 2008 presentation to Plaintiff, Defendant Victory acknowledged that subprime mortgage woes caused higher volatility and lower liquidity in the market and resulted

in negative returns for Plaintiff.  This was the first notice to Plaintiff that Defendants had engaged in violations of the Investment Policy.

54.     Defendant Victory also acknowledged that exposure to non-agency residential mortgage-backed securities caused the bulk of Plaintiff's portfolio's underperformance.

## VIII.   RELEVANT LAW

55.     ERISA § 502(a), 29 U.S.C. § 1132(a)(2), provides in pertinent part, that a civil action may be brought by a fiduciary for relief under ERISA § 409, 29 U.S.C. § 1109.

56.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

57.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a fiduciary to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

58.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

59.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence. They entail, among other things:

> (a). The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan;

> (b). The duty to follow the terms of the plan document.

> (c). The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

60.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).


## VIII.   CAUSES OF ACTION
### Breach of Fiduciary Duty Under ERISA, 29 U.S.C. 1001, et seq.

61.     Plaintiff incorporates by this reference the paragraphs above.

62.     This Count alleges fiduciary breach against:  Defendant Key bank and Defendant Victory Capital Management during such time as each served as a fiduciary or co-fiduciary to the Plan.

63.     The Defendants named in this action were fiduciaries within the meaning of 29 U.S.C. § 1002(a)(1) or 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

64.     The scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, with the care, skill, diligence, and prudence required by ERISA, in accordance with the written terms of the Investment Policy.

65.     Within the investment options permitted by the Plan, the Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested appropriately and prudently.

66.     Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, Defendants knew or should have known that investments in non-agency residential mortgaged-backed securities and/or collateralized mortgage obligations were not permissible nor suitable or appropriate investments for the Plan.

67.     The Defendants' decisions respecting the Plan's investment in these investments described above, under the circumstances alleged herein, abused any discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that such non-agency issued or backed investments of the Plan's assets was in keeping with the Plan's expectations of how a prudent fiduciary would operate.

68.　　The Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

69.　　According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

70.　　Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

　　　　i.　　A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

　　　　ii.　　Consideration of the following factors as they relate to such portion of the portfolio;

　　　　iii.　　The composition of the portfolio with regard to diversification;

iv.   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

v.   The projected return of the portfolio relative to the funding objectives of the plan.

71.      Given the conduct of the Company as described above, the Defendants could not possibly have acted prudently when they unilaterally elected to invest the Plan's assets in private, mortgage-backed securities and collateralized mortgage obligations.

72.   The success of these investments is contingent on debtors paying the underlying mortgage debt.  Further, as opposed to agency backed mortgages, which are supported by the government agencies, Defendants invested in private non-agency non-corporate residential mortgage-backed securities.   The underlying debt supporting these investments was that of individual home owners. Thus the issuers of neither the instruments, which were trusts, nor the underlying debt, which was composed of slices (tranches) of individual notes secured by residential mortgages, met the critieria spelled out in the Investment Policy.

73.   Defendants clearly understood that such investments were not proper when in October 2007 it specifically sought a modification to the Plan's Investment Policy Statement to "add Mortgage-backed (MBS), Asset-backed (ABS), and Commercial Mortgage-backed (CMBS) securities to the list of "permitted" assets in this section."

74.   The above-noted investments made in violation of a stated investment policy caused significant losses to the Plan. As described above, the Plan has suffered substantial damages in connection with losses in the Plan's value that resulted from the Defendants' deviation from the Plan's stated investment policy.

75.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a fiduciary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person

who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to

such plan any losses to the plan...." Section 409 also authorizes "such other equitable or remedial

relief as the court may deem appropriate...."

76.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the

Plan in this case.

77.     Plaintiff has tendered the securities which violate the Investment Policy to Defendants,

who have declined to repurchase them.

### IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA

fiduciary duties to the participants;

B.      An Order compelling the Defendants to make good to the Plan all losses to the Plan

resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

resulting from imprudent investment of the Plan's assets, and to restore to the Plan all

profits the Defendants made through use of the Plan's assets, and to restore to the Plan all

profits which the participants would have made if the Defendants had fulfilled their

fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly

enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plan suffered;

E.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

F.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. §

1132(g), and other applicable law; and

G.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

                                        __/s/   David W. Zoll_____
                                        David W. Zoll (0008548)

                                        __/s/   Wesley D. Merillat_____
                                        Wesley D. Merillat (0080253)
                                        ZOLL KRANZ & BORGESS, LLC